## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TRANSFORMER DISPOSAL
SPECIALISTS, INC.,

      *Plaintiff,*

  vs.                                                                                  Case No. 15-1056-EFM

TRINITY TECHNOLOGIES, INC.,
THOUSAND HILLS BUSINESS
SERVICES, LLC, DUANE KOSZALKA,
And ROBERT S. FORBES, JR.,

      *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Transformer Disposal Specialists, Inc. ("TDS") filed this suit against four Defendants. It asserted several claims, including fraud in the inducement, breach of contract, promissory estoppel, unjust enrichment, conversion, and replevin. Only one Defendant Robert S. Forbes remains in this case as will be discussed in more detail below. TDS has two summary judgment motions before the Court. TDS seeks summary judgment on a breach of contract counterclaim asserted by Defendant Trinity Technologies, Inc. ("Trinity") at one time (Doc. 79). TDS also seeks summary judgment on its breach of contract, unjust enrichment, conversion, and replevin claims against Defendants Trinity and Forbes (Doc. 88). Its motions are unopposed.

For the reasons stated below, the Court denies TDS's first summary judgment motion as moot and grants in part and denies in part TDS's second summary judgment motion.

## I.  Factual and Procedural Background[1]

Plaintiff TDS operated a plant located in Tonkawa, Oklahoma that disposed of transformers and related electrical equipment.  As part of its operations, the TDS plant processes used transformer oil in its detoxification facility ("detox facility"), where it removes polychlorinated biphenyls ("PCBs") from the oil so that the decontaminated oil can then be sold.  There are a variety of methods for removing PCBs which are in the public domain and are widely known.

In 2001, TDS entered into an agreement with Defendant Trinity for equipment and a license to use a process for removing PCBs, referred to as the GE Process.  The GE Process had been patented, but was in the public domain by 2001.  Defendant Forbes, the sole owner of Trinity, sold equipment and licensed its know-how of the GE Process to TDS, having previously licensed the technology to one of TDS's competitors.  Trinity granted TDS a fifteen year license to utilize technology called the "Trinity Process," which is actually the GE Process with a few variations.

Later, Defendant Duane Koszalka, who was then doing business with Forbes as an employee and part owner of another company, Trinity Analytical Laboratories, Inc. ("Trinity Labs"), became interested in selling another process for removing PCBs from oil.  This process was known as the Sun Ohio Process, or PCBX.  Koszalka developed the NaX Process, which is a

---

[1]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

derivative of the Sun Ohio Process and utilizes a proprietary additive.  Koszalka was the developer of the process, but Trinity owned the NaX Process.

While TDS was still using the Trinity Process, Forbes began negotiating with TDS to install the new NaX Process in TDS's detox facility.  Trinity engaged Koszalka through his company, Defendant Thousand Hills Business Services, LLC ("Thousand Hills"), to exclusively provide services on behalf of Trinity to TDS in connection with the NaX process.  Trinity had no employees and relied exclusively on Koszalka, as Thousand Hills, to provide services to TDS.

On May 14, 2008, Trinity entered into a Technology License, Construction, and Installation Agreement with TDS (the "License Agreement") relating to the NaX Process.  After execution of the License Agreement, Trinity constructed and installed the equipment necessary for TDS to operate the NaX Process at its Tonkawa plant.  TDS paid Trinity $1,125,000 as required by the License Agreement.  Specifically, the License Agreement allocated a $550,000 payment for equipment, construction, and installation.  The License Agreement also allocated $500,000 for the license to use the NaX Process ($150,000 for a technology license and $350,000 for an exclusive territory fee).

The equipment Trinity sold to TDS under the License Agreement was not manufactured by Trinity but rather by third-parties or purchased "off the shelf," including a key piece of equipment known as a program logic controller or "PLC."  The PLC is a box containing a set of electrical switches that turn valves and motors on and off in the detox facility.

From late 2008 through the fall of 2014, TDS operated the NaX Process at its Tonkawa plant.  During this same time period, TDS retained Trinity to provide consulting services related to the operation of the NaX Process.  As required by the License Agreement, TDS initially paid Trinity $2,000 a day for on-site support and $200 an hour for telephone consultations.  Between

2008 and 2014, TDS paid Trinity more than $2,000,000 for consulting services. This amount was in addition to the $1,125,000 paid for the License Agreement.

During the time Trinity's agent, Koszalka, was providing on-site consulting support to TDS, he maintained the technical information related to TDS's detox facility and the NaX Process on his own laptop and/or USB devices, which he would take with him when he left the plant.  This information was never available to TDS's owners or employees.  It was in the exclusive possession of Koszalka, despite TDS paying hundreds of thousands of dollars for the installation of equipment and license of the NaX Process.  TDS's former plant manager, Rodney Trower had Koszalka "hold" the manuals, maps and schematics necessary for operating and troubleshooting the equipment in TDS's detox facility.

In the summer of 2014, TDS began negotiations for the sale of its business to A-Line EDS, Inc. ("A-Line").  A-Line became the manager of TDS's Tonkawa facility, pursuant to an Interim Management Agreement executed in August 2014.  In or around the fall of 2014, in discussions between Koszalka and TDS, it became clear that there would be no employment opportunity for Koszalka at TDS or A-Line, and that TDS would likely no longer utilize Trinity for consulting services under the License Agreement.  Trinity's agent also learned that TDS would no longer be using the services of Trinity Labs to perform testing.

In late September or early October 2014, Koszalka showed up at the TDS plant early one morning, several hours earlier than he normally would, and he took from the TDS facility all documents and data related to the detox equipment and NaX Process covered by the License Agreement, as well as testing supplies from TDS's lab.  He took essential information and supplies that TDS required to operate, and Koszalka's conduct caused a temporary interruption in TDS's operations.  In addition, TDS's former plant manager, Trower, had Koszalka hold items

(manuals, maps, and schematics) such that that TDS was deprived of this information when new management succeeded Trower.  The information taken and/or maintained by Trinity includes, but is not limited to: manuals; PNID, tag names; PLC programs and maps; and tank, plumbing, and electrical maps all related to TDS's detox facility.  TDS demanded on numerous occasions that this information be returned.  On several occasions, TDS verbally asked Koszalka to provide the information to it.  In December 2014, TDS's President and majority owner, David Walker, emailed Koszalka, specifically requesting such items.

Throughout 2015,[2] negotiations between counsel failed to effect the return of the property.  In mid-November, TDS filed a Motion for Return of Property.  This Court held a hearing and entered an order granting TDS's motion.  Pursuant to the court order, Trinity was to return property belonging to TDS.

During the time that TDS did not have access to this property, TDS suffered damages because it was not able to repair issues that arose and it limited the amount of oil it could process.  In addition to being severely disadvantaged in its oil processing operations, TDS also lost profits that would have been earned had it been able to process a greater volume of oil.  In addition, during the period A-Line managed TDS, A-Line intended to install a dehydration system in the detox facility to improve oil processing and A-Line would have completed that work by January 1, 2015.  However, A-Line could not install the dehydration system at TDS because Trinity would not cooperate and return data.  After the data was returned pursuant to court order in December 2015, A-Line was able to, and in fact did install the dehydration system

---

[2] TDS filed suit in late February 2015.

in early 2016. TDS lost profits during the time from January 1, 2015 through January 1, 2016 as a result of Trinity's conduct.

The License Agreement provides that during the course of the Agreement, Trinity would provide both a consultant to travel to TDS's site and phone consultation. Koszalka was an independent contractor of Trinity and was the only person who ever provided any services on behalf of Trinity to TDS. Koszalka was the only individual associated with Trinity who had the ability to provide the services under the License Agreement. Forbes knew that Koszalka had communicated to TDS that he was going to separate from Trinity and that there would be nobody to provide consulting services pursuant to the Agreement. On October 30, 2014, TDS's counsel wrote Trinity's counsel that A-Line wanted to talk to Forbes to make sure that Trinity would be able to service the technology going forward. Koszalka visited TDS on December 1, 2014. He stated that the reason he met with TDS was to receive payment for outstanding invoices and get them in touch with Forbes. Koszalka, however, did not put TDS in touch with Forbes.

Throughout the months of September through December 2014, Trinity and Forbes refused to communicate with TDS. The only communication came from Trinity's and Forbes's counsel, Gary Cromwell. In September, Cromwell suggested that TDS purchase the technology license. In early November, Cromwell sent a Notice to Cure Default letter, stating that TDS had thirty days to cure its default. The purported default related to payments on three invoices. TDS's counsel wrote several letters to Cromwell regarding the alleged dispute but received no response to those letters. Instead, Cromwell sent a "formal notification" purporting to terminate the License Agreement on December 19, 2014.

During this same time period (September through December 2014), Forbes was communicating with Koszalka suggesting on several occasions that TDS should "buy out"

Trinity's interest in the NaX Process.   In October, Forbes emailed Koszalka and stated "Suggestion for buy out. $300,000 and settle for $100,000.  We could give them everything you have about the programming so a new guy could take over doing it."  In November, Forbes again suggested a buy-out to Koszalka to which Koszalka expressed his hesitation that TDS would pay any additional money considering the money TDS had "already paid for the thing."

In addition, during the fall of 2014, Koszalka engaged in communications and negotiations with Environmental Management, Inc. ("EMI") to change EMI's technology from the Trinity Process to a new process for removing PCBs.  EMI is a competitor with TDS and is in the business of removing PCBs from transformer oil.  These communications demonstrate that Koszalka prepared a technology transfer agreement for EMI which would change EMI's current technology, the Trinity Process, to a new process (NaX Process) for removing PCBs from oil. Although the word, "NaX process," was not used, the language describing the chemistry and process was identical to the language in the License Agreement between Trinity and TDS. Koszalka also obtained proposals for new equipment to change EMI's technology and prepared a Non-Disclosure Agreement for EMI.  Forbes was aware of these communications as Koszalka inadvertently sent a text message to a member of TDS's management stating, "Talked to Jon. They know nothing of my dealings with EMI – not that it would make any difference."

During Forbes's deposition, he stated that he currently lives in Ecuador.  He confirmed that Trinity was not engaged in any business.  Forbes is the sole shareholder of Trinity.  Trinity did not regularly observe corporate formalities and had no other officers other than Forbes. Forbes personally acquired all of Trinity's funds as the sole shareholder.  In the fall of 2014, Forbes's email to Koszalka stated that Forbes "took almost all the money out of [Trinity] since the Lab has not paid me for about 20 weeks.  I am running out of money."

The procedural posture of this case is a bit convoluted.  In its initial Complaint filed on February 25, 2015, TDS asserted five claims against four Defendants.[3]  Generally, Defendants Thousand Hills and Koszalka are aligned, and Defendants Trinity and Forbes are aligned. Defendant Trinity filed its Answer and asserted a counterclaim for breach of contract. Defendant Forbes had not yet been served.  TDS filed a Motion to Dismiss the Counterclaim, but this motion was denied.

On July 14, 2015, TDS filed a Motion to Amend Complaint.  TDS sought to assert two additional claims of conversion and replevin, along with the original claims of fraud in the inducement, breach of contract,[4] promissory estoppel, and unjust enrichment.  No Defendant responded to this motion.  Consequently, Magistrate Judge Gale granted the motion.  TDS filed its Amended Complaint on August 12, 2015.  Defendants Trinity and Forbes filed an Amended Answer.  Trinity and Forbes did not assert a counterclaim in this Amended Answer.

In December 2015, this Court held a hearing on TDS's Motion for Return of Property. TDS sought the return and immediate delivery of manuals, schematics, maps and information. The Court granted TDS's motion and entered a Protective Order requiring Trinity to return the property.

In late March 2016, Defendants Trinity and Forbes' counsel sought to withdraw from the case as counsel because Forbes had informed counsel that he wished to terminate counsel's services for Trinity and Forbes.  TDS responded that it did not necessarily object to counsel's withdrawal but sought guidance for procedural challenges.  Because Trinity is a corporation, it

---

[3] Not all claims were asserted against each Defendant.

[4] TDS asserted two breach of contract claims—one against Trinity and a separate one against Thousand Hills.

cannot appear without counsel.  TDS also noted that Forbes resided in Ecuador and did not effectively have a mailing address.  Magistrate Judge Gale held a hearing and allowed Trinity's and Forbes's counsel to withdraw from the case.  Thus, since April 8, 2016, Defendant Trinity has been unrepresented and Forbes is proceeding pro se.

In July 2015, TDS filed a Motion for Summary Judgment on the Counterclaim of Trinity (Doc. 79).  It sought judgment in its favor on Defendant Trinity's previous breach of contract counterclaim.  There was no response as Defendant Trinity has no appearance in the case.

In early October, TDS and Defendants Thousand Hills and Koszalka stipulated to their dismissal with prejudice from the case.  In late October, TDS filed a Motion for Summary Judgment against Defendants Trinity and Forbes (Doc. 88).  It seeks summary judgment on its breach of contract, unjust enrichment, conversion, and replevin claims.  Neither Defendant filed a response.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[7]  If the movant carries this initial burden, the nonmovant that bears the

---

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[8]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[9]   The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[10]

A pro se litigant is not excused from complying with the rules of the Court and is subject to the consequences of noncompliance.[11]   Therefore, when a pro se party fails to timely file a response, the Court will consider and decide the motion as an uncontested motion, and ordinarily, will grant the motion without further notice.[12]   Although the Court may move forward without waiting for TDS's response, the lack of response alone is not enough to grant Defendant's motion.[13]   Rather, the Court must still examine the pleadings to determine if summary judgment is appropriate.[14]   By failing to file a response within the time specified by the local rule, TDS waives the right to respond or controvert the facts asserted in the summary judgment motion.[15]   As a result, the Court accepts as true all material facts asserted and properly

---

[8] *Id.* (citing Fed. R. Civ. P. 56(e)).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[11] *Ogden v. San Juan Cty.*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that pro se litigants follow procedural rules and citing various cases dismissing pro se cases for failure to comply with the rules)).

[12] D. Kan. R. 7.4(b).

[13] *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

[14] *Id.*

supported in the summary judgment motion.[16]  "[I]f those facts entitle the moving party to judgment as a matter of law," the court will grant summary judgment.[17]

### III.    Analysis

There are two motions before the Court.  As to the first motion, TDS seeks summary judgment on Defendant Trinity's counterclaim.  Defendant Trinity asserted a counterclaim against TDS for breach of contract at one time.[18]  This counterclaim, however, was in Defendant Trinity's Answer to TDS's original Complaint.  TDS filed an Amended Complaint.  When TDS filed its Amended Complaint, the Amended Complaint became the operative pleading in the case.[19]  Defendants Trinity and Forbes answered that complaint and did not assert a counterclaim.[20]  Defendants' Amended Answer is the operative answer.[21]  Thus, because there is no breach of contract counterclaim asserted in this case, the Court denies TDS's Motion for Summary Judgment on the Counterclaim as moot.

As to the second motion, TDS seeks summary judgment in its favor on four of its claims against Defendants Trinity and Forbes.[22]  As noted above, Trinity is a corporation and not represented by counsel.  It is well established that a corporation can only appear in court through

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] Doc. 12.

[19] *See Franklin v. Kan. Dep't of Corrs.*, 160 F. App'x 730, 734 (10th Cir. 2005) ("An amended complaint supersedes the original complaint and renders the original complaint of no legal effect.").

[20] Doc. 38.

[21] *See Cont'l Credit Corp. v. Garcia*, 2016 WL 614475, at *2 (D. Colo. Feb. 16, 2016) (noting that the operative answer in the case was the one to the amended complaint which rendered the plaintiff's motion to dismiss the counterclaim as moot because it was not contained in the defendant's operative answer).

[22] TDS did not seek summary judgment on its fraud in the inducement and promissory estoppel claims.

an attorney.[23]  Thus, Trinity has no appearance in this case.  Forbes is pro se, and he failed to file a response.

TDS's facts are uncontroverted because there was no response filed.  Furthermore, on the basis of these facts, TDS provides sufficient evidence to demonstrate that there are no material issues of fact regarding two of the claims for which it seeks summary judgment.  The Court will briefly address TDS's claims.

*Breach of Contract*

TDS first seeks summary judgment on its breach of contract claim asserting that Trinity and Forbes breached the contract in several ways.  Under Kansas law, the elements of a breach of contract claim are:  "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the TDS's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of contract; and (5) damages to the TDS caused by the breach."[24]

TDS contends that Trinity marketed and disclosed the NaX Process with a competitor in violation of the License Agreement, failed to communicate with TDS's management contrary to the License Agreement, and breached its duty of good faith and fair dealing under the contract by thwarting TDS's use of the equipment and license.  Here, the uncontroverted evidence shows that the contract grants TDS an exclusive license to the NaX Process.  Specifically, the contract provides:

> Exclusive Territory.  For a period of fifteen (15) years, TRINITY agrees not to market, sell, disclose, discuss, license or operate the NaX Process, on its own behalf or on the behalf of any other entity within the Exclusive Territory,

---

[23] *DeVilliers v. Atlas Corp.*, 360 F.2d 292, 294 (10th Cir. 1966).

[24] *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083, 1098 (2013).

according to the terms and conditions set forth herein, without the prior, express written consent of TDS.  The Exclusive Territory shall be the continental United States of America consisting of the contiguous forty-eight (48) United States therein.  In exchange for this Exclusive Territory, TDS will pay TRNITY payments totaling $350,000.

Evidence also demonstrates that Koszalka, with Forbes's knowledge, engaged in communications with a competitor, EMI, in the fall of 2014.  These communications demonstrate that Koszalka prepared a technology transfer agreement for EMI which would change EMI's current technology, the Trinity Process, to a new process for removing PCB's from oil.  Although the word, "NaX process," was not used, the language describing the chemistry and process was identical to the language in License Agreement between Trinity and TDS.  Thus, the evidence demonstrates that Trinity breached its agreement in this respect.

In addition, with regard to Trinity's failure to communicate and its thwarting of TDS's use of the equipment and license, the evidence also demonstrates Trinity's culpability.  The License Agreement provides for on-site consulting support and telephone consultations.  As noted above, it also gives TDS an exclusive license to operate the NaX Process, which sometimes requires the necessity of on-site and telephone consulting.  Between the years of 2008 and 2014, TDS had paid more than $2,000,000 for these services.  Koszalka was Trinity's agent in providing this support, and Koszalka maintained the technical information on his laptop or USB drives.  Koszalka was the only person who provided technical services on behalf of Trinity.  In the fall of 2014, Koszalka would not deliver to TDS essential technical information necessary for the operation of TDS's detox facility in the manner provided for in the License Agreement.  Only after this Court ordered the return of the property did Trinity and Forbes comply by giving it to TDS.

-13-

In addition, in the fall of 2014, Forbes knew that Koszalka was planning to separate from Trinity.  Even though TDS requested information on multiple occasions as to the succession plan for consulting services, Forbes and Trinity would not communicate with TDS.  The License Agreement provided for Trinity's ongoing cooperation and services, and Trinity failed to perform this duty.  In sum, the evidence demnosrates that Trinity and Forbes were attempting to leverage or keep hostage the technology license (NaX Process) and the means in which to run it, despite TDS entering into a contract with Trinity and paying large sums of money to receive the exclusive license and the support that comes with the license for a period of fifteen years. The evidence is more than sufficient to demonstrate that Trinity breached its contract with TDS.

The final element in a breach of contract action is damages.  TDS obtained a written expert opinion from David Payne regarding TDS's damages in the form of lost profits.  Mr. Payne has an accounting degree with specialized training and has worked in the field of accounting, appraisal, financial, and damage measurement disciplines for more than thirty years. He regularly assesses and measures profitability and operating results.  He has calculated lost profit damages involving numerous environmental service and/or energy related businesses. Highly summarized,[25] Mr. Payne calculated lost profits in a timeframe that ran generally from the time that Trinity's and Forbes's wrongful acts began impacting TDS's operations (early fall 2014) through December 2015 (the time in which the Court ordered the return of TDS's property).  Mr. Payne concluded that the lost profits amounted to $1,705,307.  Thus, TDS has established damages for lost profits in this amount.

---

[25] The Court notes that the written expert report is on file as an exhibit. Thus, the detailed calculations and the method for performing these calculations can be reviewed in that exhibit, and the Court will not set forth the specific details and findings in this Order.

Finally, TDS contends that Forbes is liable for Trinity's breaches because Trinity is the mere alter ego of Forbes. "The doctrine of alter ego is used to impose liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business."[26] When imposing the doctrine of alter ego, the Court "disregards the corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation."[27] Some factors that are significant to consider include:

> (1) [u]ndercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a façade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.

Here, the evidence shows that Forbes was the only shareholder of Trinity and had no other officers or employees. Trinity did not observe corporate formalities. Forbes personally acquired all of Trinity's funds as the sole shareholder. Forbes was the sole decision-maker for Trinity. In the fall of 2014, Forbes's email to Koszalka stated that Forbes "took almost all the money out of [Trinity] since the Lab has not paid me for about 20 weeks. I am running out of money." Thus, numerous factors demonstrate that Forbes is the alter ego of Trinity. Accordingly, Forbes is liable for Trinity's conduct on the basis of alter ego. In sum, the Court grants TDS's motion for summary judgment on its breach of contract claim against both Trinity and Forbes.

### *Unjust Enrichment*

TDS claims that Trinity and Forbes were unjustly enriched when TDS paid them $500,000 for a license to use the NaX Process for fifteen years and then Trinity prevented TDS's

---

[26] *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743, 751 (1983).

[27] *Id.*

use of it in 2014.   An unjust enrichment claim requires "(1) a benefit conferred; (2) an appreciation or knowledge of the benefit by the one receiving the benefit; and (3) the acceptance or retention of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value."[28]   An unjust enrichment claim, however, is an alternative basis to a breach of contract claim.   "Unjust enrichment and restitution, or quantum meruit as it is also called, are synonymous terms for the doctrine of quasi contract."[29]   "Kansas law is clear that quasi-contractual remedies, such as unjust enrichment, are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue."[30]   The finding that an express contract governs this relationship and this issue precludes TDS's unjust enrichment claim.[31]   Thus, the Court denies TDS's motion for summary judgment on this claim.

*Conversion and Replevin*

TDS contends that Trinity and Forbes wrongfully withheld information belonging to TDS that was essential to its operation, maintenance, and improvement of its detox facility. "Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."[32]   "To state a claim for conversion under Kansas law, a plaintiff must allege that he has been deprived the use of his property."[33]   Here, Koszalka removed the documents and data that were related to the detox

---

[28] *In re Estate of Sauder*, 283 Kan. 694, 719, 156 P.3d 1204, 1220 (2007).

[29] *Regal Ware, Inc. v. Vita Craft Corp*., 653 F. Supp. 2d 1146, 1150 (D. Kan. 2006).

[30] *Ice Corp. v. Hamilton Sundstrand Inc*., 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006) (quotation marks and citations omitted).

[31] *Id.*

[32] *Bomhoff v. Nelnet Loan Servs., Inc*., 279 Kan. 415, 421, 109 P.3d 1241, 1246 (2005).

[33] *DIRECTV, Inc. v. Lockwood*, 311 F. Supp. 2d 1147, 1149 (D. Kan. 2004).

facility and the NaX Process.  For over a year, Trinity and Forbes ignored TDS's requests for its return.  Only after TDS filed a motion with this Court seeking the return and delivery of the property, which the Court granted, did TDS recover the items.  Accordingly, the Court finds that TDS demonstrates that Trinity and Forbes are entitled to summary judgment on its conversion claim.[34]

In sum, the Court finds that TDS is entitled to summary judgment on its breach of contract and conversion claims.  Summary judgment is denied on TDS's unjust enrichment and replevin claims.  With regard to the relief TDS seeks, the Court grants lost profit damages against Trinity and Forbes in the amount of $1,705,307 for the applicable damage period, as damages for breach of contract.  The Court's December 1, 2015 Order granting TDS's Motion for Return of Property will be made permanent with TDS adjudged the sole and exclusive owner of the property subject of that order.

**IT IS THEREFORE ORDERED** that TDS's Motion for Summary Judgment on the Counterclaim of Trinity Technologies (Doc. 79) is **DENIED AS MOOT**.

---

[34] TDS only briefly references replevin.  The Court has already ordered the return of the property at issue and TDS has possession of it and thus it does not appear that TDS's replevin claim is actionable.

**IT IS FURTHER ORDERED** that TDS's Motion for Summary Judgment against Trinity Technologies, Inc. and Robert S. Forbes, Jr (Doc. 88) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 21st day of December, 2016.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-18-